**Opinion issued May 16, 2017**



In The

# Court of Appeals

For The

# First District of Texas

———————————

NO. 01-16-00417-CV

NO. 01-16-00418-CV

NO. 01-16-00419-CV

———————————

## IN RE KUBOSH BAIL BONDING, KUBOSH LAW OFFICE, PAUL KUBOSH, AND FELIX MICHAEL KUBOSH, Relators

———————————

**Original Proceeding on Petition for Writ of Mandamus**

———————————

## O P I N I O N

In this mandamus proceeding, relators, Kubosh Bail Bonding, Kubosh Law Office, Paul Kubosh, and Felix Michael Kubosh (collectively, "the Kuboshes"), ask this Court to vacate the trial court's order refusing to require real parties in interest ("the Plaintiffs") to produce unredacted copies of twelve emails ("the Emails")

exchanged among one of the Plaintiffs' counsel of record, a paralegal for the other law firm representing the Plaintiffs, and Andrew Sullo, a third party defendant and also a real party in interest. The trial court ruled that the Emails were protected from discovery under the work product privilege.[1] In two issues, the Kuboshes contend that (1) the Emails do not constitute work product, or, alternatively, if the Emails are work product, they are discoverable work product, and (2) that the denial of discovery of the Emails severely compromises their ability to present their claims and defenses, thus entitling them to mandamus relief.

We conditionally grant the petitions for writ of mandamus.

## Background

Relator Paul Kubosh, an attorney, owns and operates Kubosh Law Office in the City of Houston. His brother, Felix Michael Kubosh, owns and operates Kubosh Bail Bonding. These offices are located adjacent to each other near the City of Houston municipal courts. Third-party defendant and one of the real parties in interest Andrew Sullo, also an attorney and bondsman, is a partner at Sullo & Sullo, LLP, a Houston law firm that, like the Kubosh Law Office, has a substantial practice

---

[1]    The Honorable Michael Gomez, Judge of the 129th District Court of Harris County, Texas, Respondent. The three underlying lawsuits are: *William Carter et al. v. Kubosh Bail Bonding, Kubosh Law Office, Paul Kubosh, and Felix Michael Kubosh*, No. 2013-50819 (129th Dist. Ct., Harris Cty., Tex.); *Michael Youngblood v. Kubosh Bail Bonding et al.*, No. 2015-39797 (129th Dist. Ct., Harris Cty., Tex.); and *Brandon Nash v. Kubosh Bail Bonding et al.*, No. 2015-39798 (129th Dist. Ct., Harris Cty., Tex.).

2

relating to traffic tickets and warrants arising out of unpaid tickets. The Plaintiffs are seventy-four individuals who had warrants issued against them due to unpaid traffic tickets and who approached Sullo for a bond.[2]

In 2011, the Texas Legislature enacted Government Code section 82.0651, which creates civil liability for prohibited acts of barratry. Section 82.0651(c) provides:

> A person who was solicited by conduct violating the laws of this state or the Texas Disciplinary Rules of Professional Conduct of the State Bar of Texas regarding barratry by attorneys or other persons, but who did not enter into a contract as a result of that conduct, may file a civil action against any person who committed barratry.

Act of May 5, 2011, 82nd Leg., R.S., ch. 94, 2011 Tex. Gen. Laws 534, 535 (amended 2013) (current version at TEX. GOV'T CODE ANN. § 82.0651(c)). If a

---

[2] The Plaintiffs, and remaining real parties in interest, are: Michael Youngblood, Brandon Nash, William Carter, Farid Abi-Saab, Jose Alamo, Juan Alvarez, Brian Arellano, Sandra Arnaez, Eric Ayala, Cherry Ayo-Vaughn, Gregory Barnes, Devin Barrios, Preston Bawa, Jose Campa, Edward James Carney in his capacity as representative of the Estate of Edward Buckley Carney, Eva Castillo, Jose Castro, Felipe Cavazos, Gerry Chaney, Edward Chilton, Paul Collins, Hector Cuevas, Miguel Diaz, Riggo Dominguez, Onyekachi Ekezie, Raymond Ford, Gustavo Garcia, Jaime Gaytko, Kregg Gibson, Jonathan Glenn, Elizabeth Guerrero, Shelton Harris, Mercy Hayes, Cirino Hernandez, Grant Hightower, Virginia Knauff, Roberto Lares, Walter Lethermon, Edrich Mack, Juanita Marin, Linda Martin, Baltazar Martinez, Jeanett Maya, Mauricio Mendez-Barrera, Settea Menedo, Priscilla Munoz, Kristal Orozco, Sara Padilla, Joe Pecina, Thomas Pittard, Andrew Ramirez, Janet Ramirez-Herrera, Ana Reyes, Jeffrey Rhodes, Larry Richard, Derrick Rivers, Aleicia Roberts, Jason Rocha, Cynthia Sanchez, Dorothy Scott, Ruby Sepulveda, Bolivar Sierra, Sean Simon, Randall Stevison, Eduwigis Suaste, Gina Torres, Julio Torres, Leon Tousant, Ricardo Trevino, Eduardo Valdez, Christina Villanueva, Patrick Washington, Marquis Williams, and Monica Wirz.

person prevails in a civil barratry action under section 82.0651(c), the person shall recover from each person who engaged in barratry: (1) a penalty in the amount of $10,000; (2) actual damages caused by the prohibited conduct; and (3) reasonable and necessary attorney's fees. TEX. GOV'T CODE ANN. § 82.0651(d) (West Supp. 2016). Section 82.0651(e) provides that "[t]his section shall be liberally construed and applied to promote its underlying purposes, which are to protect those in need of legal services against unethical, unlawful solicitation and to provide efficient and economical procedures to secure that protection." *Id.* § 82.0651(e). This statute became effective on September 1, 2011.

In 2013, the Texas Legislature amended section 82.0651(c) to specify that a person who was solicited by conduct violating Penal Code section 38.12(a) or (b) or Texas Disciplinary Rule of Professional Conduct Rule 7.03, as opposed to any law or disciplinary rule of Texas, but who did not enter into a contract as a result of that conduct, may file a civil action against a person who committed barratry. *Id.* § 82.0651(c). Penal Code section 38.12(a) provides that a person commits the offense of barratry or solicitation of professional employment if, with intent to obtain an economic benefit, the person:

> (1)  knowingly institutes a suit or claim that the person has not been authorized to pursue;
>
> (2)  solicits employment, either in person or by telephone, for himself or for another;

4

(3)     pays, gives, or advances or offers to pay, give, or advance to a prospective client money or anything of value to obtain employment as a professional from the prospective client;

(4)     pays or gives or offers to pay or give a person money or anything of value to solicit employment;

(5)     pays or gives or offers to pay or give a family member of a prospective client money or anything of value to solicit employment; or

(6)     accepts or agrees to accept money or anything of value to solicit employment.

TEX. PENAL CODE ANN. § 38.12(a) (West 2016). Section 38.12(b) provides that a person commits an offense if the person "knowingly finances the commission of an offense under Subsection (a)," "invests funds the person knows or believes are intended to further the commission of an offense under Subsection (a)," or "is a professional who knowingly accepts employment within the scope of the person's license, registration, or certification that results from the solicitation of employment in violation of Subsection (a)." *Id.* § 38.12(b).

Rule 7.03(a) of the Texas Disciplinary Rules of Professional Conduct provides:

A lawyer shall not by in-person contact, or by regulated telephone or other electronic contact as defined in paragraph (f) seek professional employment concerning a matter arising out of a particular occurrence or event, or series of occurrences or events, from a prospective client or nonclient who has not sought the lawyer's advice regarding employment or with whom the lawyer has no family or past or present attorney-client relationship when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain.

5

TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 7.03(a), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (West 2013) (Tex. State Bar R. art. X, § 9); *see id.* R. 7.03(f) ("As used in paragraph (a), 'regulated telephone or other electronic contact' means any electronic communication initiated by a lawyer or by any person acting on behalf of a lawyer or law firm that will result in the person contacted communicating in a live, interactive manner with any other person by telephone or other electronic means.").

Beginning in September 2011, almost immediately after section 82.0651 became effective, the Plaintiffs approached Sullo at his Houston office for a bond and representation regarding traffic tickets that were in "warrant status." Sullo averred that he informed each of the Plaintiffs about his office's "price match" program that involved the Plaintiffs calling a competing bail bond company to receive a quote and Sullo agreeing to beat the quoted price by ten dollars. Prior to making a phone call for the price match program, each Plaintiff signed a "Disclosure & Agreement" form that set out the basis of the program. This form included the following paragraph:

> **II. Potential Legal Action** — Attorney [Sullo] has reason to suspect that upon Client [the respective Plaintiff] making Client's Price Match phone call to the bond company, the Bond Company will transfer the call to a law firm without Client's request or consent. Attorney believes this action may give rise to a civil cause of action against the bond company or law firm under a new barratry statute or other law which, if successful, may result in money damages for Client. In some instances, the bond company may also quote on behalf of an

6

attorney or law firm which may also give rise to a cause of action. Client agrees to make this phone call knowing that these potentially illegal or unethical actions may occur by the bond company or law firm. After Client's phone call, Attorney will discuss with Client the potential for a legal cause of action by Client against the bond company. If Client wishes to pursue a legal cause of action against the bond company and Attorney believes a legal cause of action does indeed exist, Client will be required to sign a separate contact agreement with Attorney. By signing this Disclosure & Agreement, Client is not committed or obligated to hire Attorney to pursue a legal cause of action against the bond company.

The Disclosure & Agreement form also asked for the Plaintiffs' consent to record the phone call, stating that "[t]his recording may be used, with Client's consent, to help prove the illegal and unethical action by the bond company or law firm."

Each of the Plaintiffs, in the presence of Sullo or an employee of his law firm, made a call to Kubosh Bail Bonding. Sullo provided each Plaintiff with a printed "Instruction" sheet, which set out several questions to ask while on the phone, including a question about whether the quoted price included attorney representation and a question about whether the Plaintiff should report to Kubosh Bail Bonding or Kubosh Law Office to finalize paperwork. In each case, an employee of Kubosh Bail Bonding answered the phone and, upon discovering that the caller had traffic tickets in warrant status, transferred the call to an employee of Kubosh Law Office. This employee asked the Plaintiffs questions about their tickets and warrants, quoted a price for the bonds, and stated that the quoted price included legal representation and that Kubosh did not offer bonding services without representation. After

hanging up with the Kuboshes, each Plaintiff contemporaneously signed an "attorney-client contract" with Sullo, in which the Plaintiff "retain[ed] Attorney to prosecute all claims against all necessary defendants arising from possible acts of barratry committed in attempting to obtain legal services." The representation contract included provisions allowing for Sullo to withdraw if he determined that the claims lacked merit or were not economically feasible and allowing for Sullo to associate with other attorneys or law firms in prosecuting the case.

The majority of the Plaintiffs, including named Plaintiff William Carter, made their calls to the Kuboshes in September and October 2011. Several Plaintiffs made calls in 2012, including named Plaintiffs Michael Youngblood and Brandon Nash, and some Plaintiffs made calls as late as September 2013. Seventy-two of the Plaintiffs met with Sullo in his Houston office. Youngblood and Nash, while having traffic tickets from the City of Houston, are both residents of Beaumont, and Sullo traveled to Beaumont in September and October 2012, respectively, to meet them and to record their calls to the Kuboshes.

In early 2012, Sullo approached Brian Zimmerman, currently counsel of record for the Plaintiffs, to discuss the possibility of referring the Plaintiffs who had already made their calls to the Kuboshes to Zimmerman for prosecution of their claims. Zimmerman later declared, under penalty of perjury, that in May or June of 2012, he and Joe Fisher of Provost Umphrey, also currently counsel of record for

8

Plaintiffs, agreed to accept referral of the Plaintiffs' cases. At this point, in mid-2012, no lawsuits against the Kuboshes had been filed, and several Plaintiffs, including Youngblood and Nash, had not yet met with Sullo or made their calls to the Kuboshes. In early 2013, Sullo notified the Plaintiffs that he intended to partner with Zimmerman and Provost Umphrey to prosecute the claims, and each Plaintiff signed an agreement and also a new attorney-client contract which set out the division of any recovered attorney's fees among counsel.

On April 5, 2013, Youngblood filed suit against the Kuboshes in Jefferson County, where he lived and where he had made his call to the Kuboshes, for violation of the civil barratry statute, Government Code section 82.0651. Youngblood alleged:

> On or about September 19, 2012, Plaintiff contacted Kubosh Bail which is owned and operated by Michael Kubosh. Plaintiff had three traffic tickets on which he needed to post bonds because they were in "warrant status." Plaintiff contacted Kubosh Bail after receiving a Kubosh Bail Bonding business card containing Mike Kubosh's name, cell phone number, and office number. Based on this contact information, Plaintiff dialed the telephone number advertised on Mike Kubosh's bail bond business card. A certified transcript of the telephone conversation is attached hereto as **Exhibit "A."**
>
> A representative for Kubosh Bonding Company answered the telephone and identified the business as "Kubosh Bonding Company." After Plaintiff informed the representative of Kubosh Bail that he needed a quote for bonds for traffic tickets, the representative placed Plaintiff's call on hold. Shortly thereafter, a different representative answered the telephone, and then identified the business as "Kubosh Law." *See* **Exhibit "A."** Upon information and belief, Kubosh Law is owned and operated by Paul Kubosh.

9

> The Kubosh Law representative then quoted Plaintiff a price for a bond for his traffic cases. The representative from Kubosh Law further indicated that the price quoted for a bond included the posting of the bond ***as well as the fee for an attorney to represent Plaintiff on his traffic cases.*** Plaintiff **never** sought an attorney to represent him in connection with obtaining his bond. *Id.*

(Emphasis in original.) Youngblood also attached to this pleading a transcript of a conversation he had with Michael Kubosh shortly after Youngblood called Kubosh Bail. In this transcript, after Kubosh asked Youngblood if his staff had helped him, the transcript indicated that an "unidentified male" whispered "no." This "unidentified male" was later identified as Sullo. Youngblood's petition was signed by Zimmerman and made no mention of Sullo, who was not listed as co-counsel.

Plaintiff William Carter filed suit against the Kuboshes for civil barratry in Harris County on August 28, 2013. The allegations in this petition were nearly identical to the allegations in Youngblood's petition, although this petition indicated that Carter called Kubosh Bail on September 19, 2011. This pleading was also signed by Zimmerman and made no mention of Sullo. Over the next two months, Carter amended his petition three times to add a total of seventy-one additional Plaintiffs who had, between September 2011 and September 2013, called Kubosh Bail seeking a quote for a bond and were then transferred to Kubosh Law. The

10

allegations in the amended petitions remained nearly identical to the allegations in Youngblood's petition.[3]

On October 1, 2014, more than a year after Youngblood and Carter filed their suits against the Kuboshes, Brandon Nash also filed suit in Jefferson County. He alleged that on October 9, 2012, he called Kubosh Bail to receive a quote for a bond. He alleged:

> During the call, Kubosh Bail, working in conjunction with and/or for the benefit of Kubosh Law Office, transferred Plaintiff's call to the Kubosh Law Office, without Plaintiff's knowledge, consent, prompting or desire. By transferring Plaintiff's call, Defendants caused Plaintiff to come into unrequested direct telephone contact with the Kubosh Law Office for the purpose of aiding and abetting Kubosh Law office's efforts to obtain legal employment for its pecuniary benefit from the Plaintiff.

As with Youngblood's and Carter's petitions, Zimmerman signed Nash's petition, and the petition did not mention Sullo and his involvement.

---

[3]  In his seventh amended petition, filed January 6, 2016, Carter provided additional factual allegations, including allegations that, over the course of several years, the Kuboshes have "engaged in a pattern and practice of violations [of the civil barratry statute] as it relates to these Plaintiffs, as well as numerous others" and that "[t]he general practice at Kubosh Bail Bonding was to regularly refer unknowing clients to the Kubosh Law, which is located next door" and which shares the same phone and computer system. Carter alleged that Kubosh Bail employees "transferred each Plaintiff's call to Kubosh Law in order for Kubosh Law to solicit employment for the pecuniary benefit of attorney Paul Kubosh despite the fact that no Plaintiff sought Kubosh Law's advice regarding employment or requested communication with Kubosh Law." Carter alleged that by transferring the Plaintiffs' calls, Kubosh Bail "initiated telephonic communication and contact between Plaintiffs and Kubosh Law, in order for Kubosh Law to solicit legal representation to Plaintiffs, for Kubosh Law's pecuniary gain."

During the course of the litigation, the Kuboshes learned of Sullo's involvement with each of the Plaintiffs, and they sought discovery from Sullo of documents relating to his representation of the Plaintiffs and his connection to the case. The trial court in the Carter case ordered disclosure of Sullo's attorney-client contracts with the Plaintiffs and his referral agreements. Sullo and the Plaintiffs also produced copies of the Disclosure & Agreement forms signed by each Plaintiff prior to making their call to the Kuboshes and certified transcripts of each Plaintiff's call. Ultimately, the Kuboshes filed counterclaims against the Plaintiffs and a third-party petition against Sullo, seeking a declaration that section 82.0651 is unconstitutional and alleging causes of action for fraud and civil conspiracy, arising out of Sullo's involvement with the Plaintiffs and their calls to the Kuboshes.

On August 22, 2014, the Jefferson County district court in which the Youngblood suit was filed held a hearing on several pending motions, including motions to compel discovery responses filed by both sides. During this hearing, Joe Fisher of Provost Umphrey, on behalf of Youngblood, stated:

> But I can assure the Court that the call [to the Kuboshes] was made in Jefferson County and the reason I know that is before I even got involved in these cases Brian Zimmerman called me and said this lawyer Sullo needs to borrow your conference room to come over and see a client. So, I said okay. I wasn't there. They used my conference room and the call was made and the reason they were over here is because Mr. Youngblood lives in Jefferson County and they used my conference room and made the call.

Now, I didn't find out about that [until] later that that's what they were doing in the conference room.

After this hearing, the Kuboshes propounded discovery requests to Youngblood, Nash, and Sullo seeking, among other things, "[a]ll documents and records reflecting oral or written communications regarding the reservation and use of the conference room at Provost Umphrey for the making and recording of Youngblood's and Nash's calls to the Kuboshes."

In October 2014, the Kuboshes amended their counterclaims and third-party claims to also assert violations of the federal Racketeering Influenced and Corrupt Organizations Act ("RICO") against the Plaintiffs and Sullo. The Kuboshes alleged that the Plaintiffs and Sullo "formed a RICO association-in-fact enterprise with common and continuing purposes, namely, to serve as a flexible vehicle for [Sullo's] filing of vengeful, Fraud on the Court lawsuits to destroy or degrade Sullo's competitors Michael Kubosh and Paul Kubosh by embroiling them in legally meritless but expensive and time-consuming 'civil barratry' litigation." As predicate acts under RICO, the Kuboshes alleged that Sullo and the Plaintiffs engaged in mail fraud and wire fraud.

In April 2015, the judicial panel on multidistrict litigation transferred Nash's suit and Youngblood's suit to the Harris County district court in which Carter's suit was pending for the resolution of pretrial proceedings. *See* TEX. GOV'T CODE ANN. § 74.162 (West 2013) (providing for transfer of "civil actions involving one or more

13

common questions of fact pending in the same or different constitutional courts, county courts at law, probate courts, or district courts to any district court for consolidated or coordinated pretrial proceedings, including summary judgment or other dispositive motions, but not for trial on the merits").

After failing to receive the requested discovery of communications relevant to reserving the conference room at Provost Umphrey to record Youngblood's and Nash's calls to the Kuboshes, the Kuboshes moved the MDL court to compel production of the twelve Emails at issue in this mandamus proceeding. In response, the Plaintiffs argued that their withholding of the Emails was proper because the Emails—between Zimmerman, Sullo, and staff for Fisher "related to meetings involving potential clients"—constituted privileged work product. Under penalty of perjury, Zimmerman declared,

> Defendants are seeking communications between myself, co-counsel Provost Umphrey, and Andrew Sullo, my client and Plaintiffs' representative, that were made in connection with the representation of already existing clients or the representation of potential clients. My communications with Sullo and the Law Firm of Provost Umphrey were made for the purpose of investigating claims and providing legal representation for Michael Youngblood and Brandon Nash as well as for providing legal representation and investigating claims on behalf of the Plaintiffs in this case.

The trial court ordered the Plaintiffs to produce the Emails for an in camera inspection. The Plaintiffs did so and also produced a privilege log indicating that they had withheld fourteen emails dated from July 28, 2012, to October 8, 2012, and

14

exchanged among Sullo, Zimmerman, and Sasha Kimball, a Provost Umphrey paralegal. The trial court also ordered the Plaintiffs to produce the Emails to the Kuboshes with minimal redactions. The version of the Emails that the Plaintiffs produced contained numerous redactions, including emails in which the entire body of the email was redacted and emails in which the subject matter was redacted, in addition to redactions within the body of the email. The only information contained in the redacted Emails are requests from Sullo to Kimball to reserve a conference room at Provost Umphrey on September 19, 2012, and October 9, 2012, as well as Kimball's responses confirming the dates and times.

The trial court held several hearings relating to the production of the Emails. The Plaintiffs argued that, at the time of the Emails, from July to October 2012, the majority of the Plaintiffs had already made their calls to the Kuboshes, had signed attorney-client contracts with Sullo, and had been referred to Zimmerman and Provost Umphrey, and, therefore, the Emails were made "clearly in anticipation of litigation of the global prosecution of these matters." The Plaintiffs thus argued that because the Emails were exchanged in anticipation of litigation, they constituted privileged work product. The trial court agreed and denied the Kuboshes' motion to compel. The trial court specifically found that the redacted portions of the Emails constituted "work product that is not discoverable pursuant to Texas Rule of Civil Procedure 192.5."

After the trial court denied the Kuboshes' motion to reconsider, this mandamus proceeding followed.

**Mandamus Standard of Review**

Generally, to be entitled to mandamus relief, the relators must demonstrate that the trial court abused its discretion and that they have no adequate remedy by appeal. *See In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex. 2004) (orig. proceeding); *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding). A trial court clearly abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Walker*, 827 S.W.2d at 839. A trial court has no discretion in determining what the law is or in applying the law to the facts. *Id.* at 840. Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *In re Allstate Cty. Mut. Ins. Co.*, 85 S.W.3d 193, 195 (Tex. 2002) (orig. proceeding).

When the trial court's discovery error vitiates or severely compromises a party's ability to present a viable claim or defense at trial, an appeal is not an adequate remedy. *Walker*, 827 S.W.2d at 843. "[A] denial of discovery going to the heart of a party's case may render the appellate remedy inadequate." *Id.* It is not enough "to show merely the delay, inconvenience or expense of an appeal." *Id.* Rather, to be entitled to mandamus relief, the relators must demonstrate "the

effective denial of a reasonable opportunity to develop the merits of his or her case, so that the trial would be a waste of judicial resources." *Id.*

## Work Product Privilege

In their first issue, the Kuboshes contend that the Emails do not constitute work product, or, alternatively, that they constitute discoverable work product.

### A.     *Extent of Work Product Privilege*

The United States Supreme Court adopted the work product doctrine in the 1947 case of *Hickman v. Taylor*, noting that "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel."  329 U.S. 495, 510, 67 S. Ct. 385, 393 (1947); *see In re Bexar Cty. Criminal Dist. Attorney's Office*, 224 S.W.3d 182, 186 (Tex. 2007) (recognizing that Supreme Court adopted work-product doctrine in *Hickman* and stating that Texas discovery rules "protect those materials prepared by or at the request of an attorney in anticipation of litigation").  In Texas, Texas Rule of Civil Procedure 192.5(a) provides that "work product" is composed of:

> (1)     material prepared or mental impressions developed in anticipation of litigation or for trial by or for a party or a party's representatives, including the party's attorneys, consultants, sureties, indemnitors, insurers, employees, or agents; or

> (2)     a communication made in anticipation of litigation or for trial between a party and the party's representatives or among a party's representatives, including the party's attorneys, consultants, sureties, indemnitors, insurers, employees, or agents.

TEX. R. CIV. P. 192.5(a).  Rule 192.5 further provides that "core work product,"

defined in the rule as "the work product of an attorney or an attorney's representative

that contains the attorney's or the attorney's representative's mental impressions,

opinions, conclusions, or legal theories," is not discoverable.  TEX. R. CIV. P.

192.5(b)(1). "Any other work product" is discoverable if the party seeking discovery

demonstrates a "substantial need of the materials in the preparation of the party's

case" and that the party "is unable without undue hardship to obtain the substantial

equivalent of the material by other means."  TEX. R. CIV. P. 192.5(b)(2).

The purpose of the work product doctrine is to "preserve[] the rights of

attorneys to thoroughly prepare cases for trial and to investigate both favorable and

unfavorable aspects of their cases, while preventing attorneys from taking advantage

of their opposing counsel's efforts."  *In re Baytown Nissan Inc.*, 451 S.W.3d 140,

147 (Tex. App.—Houston [1st Dist.] 2014, orig. proceeding); *see Owens-Corning

Fiberglas Corp. v. Caldwell*, 818 S.W.2d 749, 750 (Tex. 1991) (orig. proceeding)

("The primary purpose of the work product rule is to shelter the mental processes,

conclusions, and legal theories of the attorney, providing a privileged area within

which the lawyer can analyze and prepare his or her case.").  The work product

privilege exempts from discovery an attorney's documents, reports,

communications, memoranda, mental impressions, conclusions, opinions, or legal

18

theories "if generated in anticipation of litigation." *In re Baytown Nissan*, 451 S.W.3d at 148.

A party satisfies the "anticipation of litigation" test when the party demonstrates that "a reasonable person would have concluded from the totality of the circumstances that there was a substantial chance that litigation would ensue and the party asserting the work product privilege subjectively believed in good faith that there was a substantial chance that litigation would ensue." *Id.*; *see Nat'l Tank Co. v. Brotherton*, 851 S.W.2d 193, 204 (Tex. 1993) (orig. proceeding). The subjective portion of this test "is properly satisfied if the party invoking the privilege believes in good faith that there is a substantial chance that litigation will ensue," and the test does not require the party invoking the privilege "to be absolutely convinced that litigation will occur." *Brotherton*, 851 S.W.2d at 204. To determine when a party reasonably anticipates or foresees litigation, we look to the totality of the circumstances and decide whether a reasonable person in the party's position would have anticipated litigation and whether the party actually did anticipate litigation. *In re Monsanto Co.*, 998 S.W.2d 917, 923–24 (Tex. App.—Waco 1999, orig. proceeding) (citing *Trevino v. Ortega*, 969 S.W.2d 950, 956 (Tex. 1998)).

The work product privilege is "of continuing duration." *Owens-Corning Fiberglas*, 818 S.W.2d at 751–52. As such, the privilege is "not applicable solely to the lawsuit in which it arises." *In re Baptist Hosps. of Se. Tex.*, 172 S.W.3d 136, 144

(Tex. App.—Beaumont 2005, orig. proceeding) ("Thus, the work product developed in anticipation of, and during, Baptist's litigation against the contractors extends to BSA's [subsequent] intervention against Baptist in the same suit.").

Here, the Kuboshes contend that the work product privilege does not apply to the Emails because the Emails were exchanged before plaintiffs Youngblood and Nash made their phone calls to the Kuboshes while meeting with Sullo and thereby suffered an alleged injury and, thus, the Plaintiffs cannot establish that the parties invoking the privilege, Youngblood and Nash in particular, believed "in good faith that there [was] a substantial chance that litigation [would] ensue," as required to show that the Emails were exchanged in anticipation of litigation. The Plaintiffs argue that the work product privilege should apply, and that the Emails were exchanged in anticipation of litigation, because sixty-eight of the Plaintiffs had made calls to the Kuboshes and had signed representation agreements for their barratry causes of action, and as part of the "global prosecution of the litigation," the Plaintiffs' counsel "possessed a good faith belief prior to the creation and transmission of the Privileged Emails that the barratry litigation against [Kubosh] would ensue." We agree with the Kuboshes.

The Plaintiffs began making calls to the Kuboshes in September 2011, almost immediately after section 82.0651 became effective. These plaintiffs contemporaneously signed representation agreements with Sullo authorizing him "to

prosecute all claims against all necessary defendants arising from possible acts of barratry committed in attempting to obtain legal services." By June 2012, sixty-eight Plaintiffs had made calls to the Kuboshes, and Zimmerman Axelrad and Provost Umphrey had agreed to accept referral of these cases from Sullo, although none of the Plaintiffs had been notified about the referral at this point. At this point in time, no lawsuit against the Kuboshes had been filed.

In July 2012, Sullo contacted Zimmerman by email about reserving a conference room in Beaumont to meet a potential client for the barratry litigation. Over the course of the next two months, Sullo, Zimmerman, and Kimble, a Provost Umphrey paralegal, exchanged the Emails at issue concerning reservation of a Provost Umphrey conference room to meet with potential clients. In producing redacted copies of the Emails to the Kuboshes, the Plaintiffs redacted the names of the potential clients and other information concerning the purpose of using the conference room. The Emails were exchanged before Sullo met with Youngblood and Nash at Provost Umphrey to call the Kuboshes and thus were necessarily exchanged before Youngblood and Nash, who had had no prior contact with the Kuboshes before the calls that they made in Sullo's presence in Beaumont, suffered an alleged injury.

In determining whether communications were made "in anticipation of litigation" for purposes of applying the work product privilege, courts consider not

only whether a reasonable person would have concluded from the totality of the circumstances that there was a substantial chance that litigation would ensue, but also whether "*the party invoking the privilege* believes in good faith that there is a substantial chance that litigation will ensue." *Brotherton*, 851 S.W.2d at 204 (emphasis added); *In re Baytown Nissan*, 451 S.W.3d at 148. The Plaintiffs argue that, as a result of the calls that had been made by sixty-eight plaintiffs to the Kuboshes from September 2011 to June 2012, by the time the Emails were exchanged beginning in late July 2012, the Plaintiffs' "counsel possessed a good faith belief prior to" the exchange of the Emails that litigation against the Kuboshes would ensue. However, the inquiry is not whether *counsel* possessed a good faith belief that litigation would ensue but rather whether *the party invoking the privilege* possessed a good faith belief. Here, at the time of the Emails, Youngblood and Nash had not had contact with the Kuboshes and had not yet suffered the alleged injury on which their subsequent lawsuits were based. Under these facts, at the time of the Emails exchanged among the lawyers, there is no proof that Youngblood and Nash subjectively believed in good faith that litigation by these Plaintiffs against the Kuboshes would ensue. *See Brotherton*, 851 S.W.2d at 204; *In re Baytown Nissan*, 451 S.W.3d at 148; *see also In re Maher*, 143 S.W.3d 907, 914 (Tex. App.—Fort Worth 2004, orig. proceeding) (holding that party asserting work product privilege did not satisfy subjective requirement of whether it, in good faith, anticipated

litigation, in part because it provided no affidavits or testimony at hearing in support of privilege).

Plaintiffs cite *Brotherton* for the proposition that "anticipation of litigation" does not require the plaintiff to have manifested an intent to sue. 851 S.W.2d at 204. Likewise, they cite the Austin Court of Appeals' decision in *Wiley v. Williams* for the proposition that litigation can be reasonably anticipated before the party hires an attorney. 769 S.W.2d 715, 718 n.2 (Tex. App.—Austin 1989, orig. proceeding). These are correct statements of law. These cases do not, however, hold that litigation can be reasonably anticipated before the party invoking the privilege even suffers an alleged injury, which is the situation in this case with regard to Youngblood and Nash.

Furthermore, we note that the Texas Supreme Court has held that the work product privilege is "of continuing duration," *see Owens-Corning Fiberglas*, 818 S.W.2d at 751–52, and that courts have interpreted this to mean the privilege is "not applicable solely to the lawsuit in which it arises." *In re Baptist Hosps. of Se. Tex.*, 172 S.W.3d at 144. In holding that the work product privilege is of continuing duration, the Texas Supreme Court stated that "any party which is a repeat litigant clearly must be allowed to develop an overall legal strategy for all the cases in which it is involved" and gave examples including "a corporation sued repeatedly in products liability, a civil rights organization suing repeatedly to enforce

desegregation of schools, or an environmental group which must sue again and again to redress environmental wrongs." *Owens-Corning Fiberglas*, 818 S.W.2d at 751. In *Owens-Corning Fiberglas*, a case involving asbestos litigation, the trial court ordered Owens-Corning to produce work product that had been created during the course of previous litigation because the documents "had not been generated specifically in defense of the instant case." *Id.* at 750. In ruling that the trial court had abused its discretion by ordering the production, the Texas Supreme Court held that work product created by a party in one case retains its privileged character in subsequent litigation. *Id.* at 751–52; *cf. In re Baptist Hosps. of Se. Tex.*, 172 S.W.3d at 144 (holding that privileged work product developed in anticipation of litigation between Baptist Hospitals and its contractors in breach of contract suit arising out of construction of ambulatory surgical center retained its privileged character when Baptist Hospitals' tenant subsequently intervened in same suit and sought production of work product).

Here, however, the "repeat litigant" is the Kuboshes, who are defending against three separate, but related, suits by three groups of Plaintiffs, who are the parties claiming work product privilege. The Carter Plaintiffs, most of whom had made their calls to the Kuboshes by the time the Emails were exchanged, are not also plaintiffs in Youngblood's or Nash's suits. They are thus not themselves repeat litigants; nor is Youngblood or Nash. This is therefore not a situation in which a

plaintiff generates privileged work product in anticipation of litigation in one case and then files subsequent suits against different defendants, all of which involve use of the same work product. Nor is this a situation in which a defendant generates privileged work product in anticipation of defending itself in litigation and then seeks protection from production of that work product in later lawsuits on the same issue. *See, e.g.*, *Owens-Corning Fiberglas*, 818 S.W.2d at 750–52; *see also Humphreys v. Caldwell*, 888 S.W.2d 469, 471 (Tex. 1994) (per curiam) (holding that privileged work product created by attorney for defendant in car-accident litigation retained privileged character in subsequent litigation between car-accident plaintiff and car-accident defendant's insurer). Instead, in this situation, some plaintiffs in one suit had already suffered their alleged injuries, but the plaintiffs in related, but separate, suits, who were the subject of the challenged communications, had not yet suffered *their* alleged injuries, and all of the Plaintiffs seek protection from production of the challenged communications.

We conclude that because the Emails were exchanged prior to Youngblood's and Nash's suffering an alleged injury, Youngblood and Nash did not have a good faith belief that there was a substantial chance that litigation would ensue on their behalf, and, therefore, the Emails were not created and exchanged in "anticipation of litigation." *See Brotherton*, 851 S.W.2d at 204; *In re Baytown Nissan*, 451 S.W.3d

25

at 148. Thus, we hold that the trial court abused its discretion by ruling that the Emails were privileged work product that should not be produced to the Kuboshes.

## B. Offensive Use of Work Product Privilege

Furthermore, even if the Emails do constitute privileged work product, we agree with the Kuboshes that the Plaintiffs have waived their privilege as a result of their offensive use of the Emails. As the Texas Supreme Court has held, "A plaintiff cannot use one hand to seek affirmative relief in court and with the other lower an iron curtain of silence against otherwise pertinent and proper questions which may have a bearing upon his right to maintain his action." *Ginsberg v. Fifth Court of Appeals*, 686 S.W.2d 105, 108 (Tex. 1985) (orig. proceeding); *In re Sw. Airlines Co.*, 155 S.W.3d 622, 624 (Tex. App.—San Antonio 2004, orig. proceeding). An offensive, rather than a defensive, use of a privilege "lies outside the intended scope of the privilege." *Alford v. Bryant*, 137 S.W.3d 916, 921 (Tex. App.—Dallas 2004, pet. denied) (citing *Ginsberg*, 686 S.W.2d at 107); *see also Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 163 (Tex. 1993) (stating, in context of whether attorney-client privilege has been waived, that "[i]n an instance in which the privilege is being used as a sword rather than a shield, the privilege may be waived"). The work product privilege can be waived by a party's offensive use of the privilege. *Lewis v. Wittig*, 877 S.W.2d 52, 57 (Tex. App.—Houston [14th Dist.] 1994, orig. proceeding); *see also Occidental Chem. Corp. v. Banales*, 907 S.W.2d 488, 490

(Tex. 1995) (per curiam) (orig. proceeding) ("[T]he work product privilege may be waived under the offensive use doctrine.").

To determine whether an offensive-use waiver has occurred, courts consider the following factors: (1) whether the party asserting the privilege has sought affirmative relief; (2) the information sought must be such that, if believed by the factfinder, in all probability it would be outcome-determinative of the cause of action asserted; and (3) disclosure of the information must be the only means by which the aggrieved party may obtain the evidence. *Davis*, 856 S.W.2d at 163; *In re Sw. Airlines*, 155 S.W.3d at 624; *In re United Supermarkets, Inc.*, 36 S.W.3d 619, 621 (Tex. App.—Amarillo 2000, orig. proceeding) ("The theory underlying the waiver of a privilege by its offensive use is that a party who is seeking affirmative relief should not be permitted to maintain an action, and at the same time, maintain evidentiary privileges that protect from discovery outcome determinative information not otherwise available to the other party."). Mere relevance or a contradiction in position, without more, is insufficient for offensive-use waiver; instead, the privileged information "must go to the very heart of the affirmative relief sought." *Davis*, 856 S.W.2d at 163. "If any one of these requirements is lacking, the trial court must uphold the privilege." *Id.*

The Plaintiffs here clearly seek affirmative relief under section 82.0651, including statutory penalties, actual damages, and attorney's fees. *See* TEX. GOV'T

27

CODE ANN. § 82.0651(d) (stating allowable damages). Second, among the defenses the Kuboshes raise to the Plaintiffs' claims are their assertions that they did not improperly solicit the Plaintiffs, that the Plaintiffs suffered no injury as a result of their conduct, and that the Plaintiffs improperly brought their lawsuit to receive damages without suffering an actual injury. The Emails demonstrate that Plaintiffs' counsel and Sullo worked together to set up Youngblood's and Nash's phone calls to the Kuboshes, expecting that they would suffer an "injury" and then participate in litigation against the Kuboshes, albeit in Jefferson County instead of Harris County. If believed by the factfinder, in all probability, the Emails would be outcome-determinative of the Plaintiffs' cause of action for civil barratry, as they call into question whether the Plaintiffs suffered an injury when they called the Kuboshes. *See Davis*, 856 S.W.2d at 163 (noting that, to satisfy offensive-use doctrine, mere relevance of privileged information is not enough, but information must instead "go to the very heart of the affirmative relief sought"). Finally, disclosure of the Emails is the only means by which the Kuboshes can obtain evidence that Plaintiffs' counsel and Sullo set up meetings with Youngblood and Nash specifically so they could call the Kuboshes and potentially join in the litigation.

We conclude that, even if the Emails constitute work product, the Plaintiffs have waived the work product privilege under the offensive use doctrine. *See id.*; *Ginsberg*, 686 S.W.2d at 107–08; *In re Sw. Airlines*, 155 S.W.3d at 624–25; *Alford*,

28

137 S.W.3d at 922. We therefore hold that the trial court abused its discretion by failing to order the Plaintiffs to disclose the unredacted Emails to the Kuboshes.

### C. Compromise of Ability to Present Claims or Defenses

Having determined that the trial court erred by failing to require the Plaintiffs to produce the Emails to the Kuboshes, we now consider whether the Kuboshes have demonstrated their entitlement to mandamus relief by showing that the discovery error severely compromises their ability to present a viable claim or defense at trial, as argued in their second issue. *See Walker*, 827 S.W.2d at 843.

In their live pleading, the Kuboshes raise several defenses and affirmative claims for relief against both the Plaintiffs and against Sullo as a third-party defendant. In addition to alleging that their actions did not violate section 82.0651, the Kuboshes allege that the Plaintiffs' lawsuits were "brought for an improper purpose" and are a "fraud against the Kuboshes and a fraud on the Court." The Kuboshes also allege, "The entire set-up of these lawsuits is fraudulent and the lawsuits [are] part and parcel of the criminal enterprise. The phone calls [to the Kuboshes] were made by the Plaintiffs by agreement with Sullo knowing they would be transferred and for the express purpose to stage and bring the lawsuits against the Kuboshes." As a defense, the Kuboshes assert that the Plaintiffs have not suffered an actual and concrete injury, and that a "bare statutory violation" by the Kuboshes, if any such violation of section 82.0651 occurred as a result of their actions, does

not confer standing on the Plaintiffs to sue under section 82.0651. The Kuboshes specifically allege that "Plaintiffs made the calls [to the Kuboshes] in conspiracy with Sullo for the express purpose of creating the lawsuits."

As an affirmative defense, the Kuboshes allege that the Plaintiffs' recovery on their civil barratry claims is barred "by the affirmative defenses of illegality, fraud, contravention of public policy, and unclean hands." The Kuboshes also assert several claims for affirmative relief, including a declaration that section 82.0651 is unconstitutional, a cause of action for civil conspiracy, causes of action for RICO violations, and causes of action for violation of the federal wiretap statute and the Texas Interception of Communication Act. Specifically, the Kuboshes allege that the Plaintiffs and Sullo committed the RICO predicate acts of mail fraud and wire fraud.

Central to both the Kuboshes' defenses to the section 82.0651 claims brought against them as well as their affirmative claims for relief is their contention that Sullo orchestrated the Plaintiffs' claims and set up the telephone calls that became the basis for the Plaintiffs' claims. With respect to their RICO claims, they assert that Sullo and the Plaintiffs engaged in a scheme to bring fraudulent and meritless causes of action against them for alleged violations of the civil barratry statute. The Kuboshes argue that the Emails are necessary to show that "there can be no 'solicitation' by the Kuboshes on facts where Plaintiffs were recruited and provided

consideration by Sullo" and that "the litigation before the court is part of the continuous racketeering activity for which the Kuboshes sue." We agree that the Emails are critical to the Kuboshes' defenses and affirmative claims.

The Emails do not merely include discussions about the logistics of reserving a conference room at Provost Umphrey so Youngblood and Nash can make their calls to the Kuboshes. Instead, they are relevant to the Kuboshes' contention that the Plaintiffs were improperly solicited to bring the claims against them and that the civil barratry claims were brought for an improper purpose. These emails go to the heart of the Kuboshes' case. *See Walker*, 827 S.W.2d at 843. Without these Emails, the Kuboshes' ability to present a viable claim or defense at trial is severely compromised. *See id.*; *see also In re State Farm Mut. Auto. Ins. Co.*, 982 S.W.2d 21, 24 (Tex. App.—Houston [1st Dist.] 1998, orig. proceeding) (holding relator entitled to mandamus relief to correct denial of discovery because, without requested discovery, relator "cannot develop facts consistent with a fraudulent scheme" and relator's "ability to defend the lawsuit and to prosecute its counterclaim will be vitiated"); *ISK Biotech Corp. v. Lindsay*, 933 S.W.2d 565, 569 (Tex. App.—Houston [1st Dist.] 1996, orig. proceeding) (granting mandamus relief because "the documents ISK sought plainly go to the heart of ISK's fraud case" and "[t]he lack of those documents will severely compromise ISK's ability to present a viable fraud claim at trial"). We therefore hold that mandamus relief is warranted in this case.

31

We sustain the Kuboshes' first and second issues.

## Conclusion

We conditionally grant the Kuboshes' petition for writ of mandamus and order the trial court to vacate its order denying the Kuboshes' production of the unredacted Emails. The writ will only issue if the trial court fails to comply.

Evelyn V. Keyes
Justice

Panel consists of Justices Jennings, Keyes, and Brown.